UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL J. HICKS, | No. C 12-2207 SI (pr) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| LINDA NEAL; et al., | |
| Defendants. / | |

## INTRODUCTION

Michael J. Hicks filed this *pro se* civil rights action under 42 U.S.C. § 1983, complaining about his 3-month stay at the Salinas Valley Psychiatric Program, a "psychiatric hospital within a prison," where inmates from all over the state could be temporarily sent for psychiatric care within a maximum security prison setting. Docket # 59-5 at 3. Defendants now move for summary judgment on plaintiff's claims. Plaintiff opposes the motion. For the reasons discussed below, the motion will be granted and judgment entered in defendants' favor. This order also addresses miscellaneous motions from plaintiff.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

Michael Hicks is a prisoner of the State of California. He was housed in the Salinas Valley Psychiatric Program ("SVPP") from approximately October 11, 2011 through approximately January 16, 2012. Hicks was housed at Pelican Bay State Prison before his transfer to SVPP, and was returned to Pelican Bay after his stay at SVPP. According to prison records, Hicks is now serving a sentence of 60-years-to-life sentence for a 1992 conviction for

1  rape, oral copulation, and kidnapping. Hicks' prior criminal history includes a 1977 conviction
2  for rape, a 1977 conviction for felony escape, and a 1986 conviction for assault to commit rape.

Defendants worked at SVPP during the relevant time. William Kulka, M.D., was a psychiatrist and was part of the treatment team for Hicks. Michael Knapp was an associate clinical social worker was assigned to Hicks' team. Rejinther Dosange, a health program coordinator at SVPP, denied Hicks' inmate appeal dated October 15, 2011 at the first level. Linda Neal, a clinical administrator at SVPP, denied the inmate appeal at the second level.

A.  <u>Salinas Valley Psychiatric Program</u>

Hicks was transferred to SVPP pursuant to California Penal Code § 2684. Section 2684 allowed prison officials to send an inmate to a state hospital if his rehabilitation might be expedited by treatment at one of those hospitals. Once the inmate was sent to the hospital, the hospital superintendent keeps the inmate "until in the opinion of the superintendent the person has been treated to the extent that he or she will not benefit from further care and treatment in the state hospital." Cal. Penal Code § 2684 (2011 version).

SVPP was a 370-bed inpatient intermediate care program that provided mental health services to adult male inmates who had been referred to SVPP for extensive psychiatric care.

> These inmates often have a history of substance abuse and suicidal ideation. Accordingly, these individuals generally require symptom stabilization and diagnostic clarification to enhance their prognosis for treatment. Effective treatment requires an empirical understanding of the inmate population and, thus individualized treatment programs are created, based on the unique psychiatric, social and psychological characteristics present in each individual patient. To encourage positive programming SVPP has created an incentive program for the inmate/patients, which is divided into four stages: Orientation, Stage I, Stage II, and Stage III. Sufficient flexibility is maintained to accommodate a wide range of special needs and functioning levels.

Docket # 64-1 (Kulka Declaration) at 2-3. The facility was run by the California Department of State Hospitals during the relevant time.[1] Increased benefits were available for the inmate as

---

[1] Due to a name change and organizational restructuring, there are some name inconsistencies about SVPP, but they are immaterial to plaintiff's claims. Plaintiff identified it as a Department of Mental Health facility in his complaint, and defendants declare that it is run by the Department of State Hospitals. According to the state government website: "As of July 1, 2012, the California Department of Mental Health became the new Department of State Hospitals." www.dsh.ca.gov/Publications/TransitionAndReorg.asp (last visited on October 24, 2013). Some of the

2

1 he moved to each higher stage at SVPP. Docket # 59-5 at 8. An inmate could be put on
2 Discretionary Programming Status ("DPS") when his behavior was not conducive to
3 programming safely, and that status could result in certain restrictions on the inmate. For
4 example, as happened with Hicks, an inmate might not be promoted to a higher stage of the
5 incentive program when he was on DPS.

6 The SVPP's patient population came from and was returned to California's prisons. The
7 SVPP "ultimately seeks to restore each patient to a level of functioning suitable for living within
8 the correctional setting. Once the maximum benefit of the program is achieved, the patient is
9 returned to his original [CDCR] institution, where the next step for the inmate is determined
10 (e.g., parole, transfer to another facility within the Department of State Hospitals, etc.)." Docket
11 # 64-1 at 3.

12 SVPP did not offer treatment for sexual disorders. Docket # 64-1 at 3.

### B. Hicks' Care At SVPP

On October 11, 2011, Pelican Bay doctors sent Hicks to SVPP with these diagnoses: Axis I diagnoses of psychosis not otherwise specified ("NOS"), polysubstance abuse and rule out schizoaffective disorder (severe); and Axis II diagnoses of antisocial personality disorder and narcissistic personality disorder. Docket # 64-1 at 3; DHS 198.[2] Over the past several decades, Hicks had received several different psychiatric diagnoses.[3] Upon his arrival, Hicks had a

---

programs formerly under the purview of the Department of Mental Health were transferred to other departments and to counties, and the new Department of State Hospitals would focus on the care of patients in the seven forensic state hospitals. *See id.* The Department of State Hospitals' website now identifies the facility at Salinas Valley as "DSH - Salinas Valley." www.dsh.ca.gov/hospitals/default.asp (last visited on October 24, 2013). For sake of consistency and clarity, the court will refer to the facility as SVPP, and its organizational parent as the Department of State Hospitals.

[2]The Department of State Hospitals' Bates-stamped documents filed under seal as Exhibit A to the Kulka Declaration are referred to as "DSH ###" in this order.

[3]According to the psychological assessment dated October 19, 2011, Hicks "'has had a variety of diagnosis (sic) while incarcerated. Some mental health professionals have viewed him as having a serious Axis I disorder, such as Schizophrenia, Paranoid Type; Schizoaffective Disorder, Bipolar Type; Bipolar I Disorder, Adjustment Disorder; No Axis I Disorder; Sexual Sadism; Attention Deficit Hyperactivity Disorder and Malingering.'" DSH 202. The report also noted that past records showed

3

reported history of multiple behavioral problems, including anger management, violence, problems with authority, deceitfulness, manipulation, impulsivity and maladaptive coping. Docket # 64-1 at 3; DHS 199. Hicks also had experienced more than three mental health crisis bed admissions and more than three rule violation reports in the past three months. DSH 199. Upon his admission to SVPP, the following "alerts" were issued regarding Hicks: "suicidal history, self-abusive, assaultive, drug abuse history and blood/bodily fluids precaution." Docket # 64-1 at 4; DSH 22, 199. The treatment outcome expectations listed for Hicks were to increase anger management skills, eliminate suicidal ideation and mental health crisis bed admissions, increase relational capacity, change criminal thinking, and change his maladaptive coping style. Docket # 64-1 at 4; DSH 198-206. Upon his arrival, Hicks was taking lithium.

At Hicks' initial appearance before the treatment team that included defendants Kulka and Knapp, Hicks "expressed a desire to engage in 'one on one' sexual disorder psycho-therapy with a clinician trained in the field of sexual disorders. . . . Kulka and Knapp informed [Hicks] that the treatment program consisted of educational group therapey (sic) and that targeted sexual disorder treatment would not be provided." Docket # 13 at 3. Hicks then began his inmate appeal efforts to obtain the desired treatment. *Id.* (The appeal is discussed in the next section.)

On October 18, 2011, Hicks threatened to harm staff members and encouraged another patient to throw urine on staff. Also on October 18, 2011, the treatment plan for Hicks indicated that several changes had been made to his diagnoses: "(1) remove schizoaffective disorder (Axis I), as it had been ruled out; (2) remove psychosis NOS from Axis I; (3) Note 'diagnosis deferred' on Axis I; (4) Axis II: remove antisocial personality disorder ("ASPD") and narcissistic personality disorder; (5) add 'Personality Disorder NOS with ASPD, Narcissistic and Borderline traits.' and (6) Global Assessment of Functioning ('GAF') score lowered to 40 from 50." Docket # 64-1 at 4.

---

additional past diagnoses of Personality Disorder NOS, Poly-Substance Dependence and Mood Disorder NOS. *Id.*

Hicks presented exhibits that included an Axis I sexual sadism diagnosis in 1983 and 1996. *See* Docket # 59-1 at 6, and 14. And he presented an exhibit that did not include an Axis I sexual sadism diagnosis in 1999. Docket # 59-1 at 17.

4

On October 20, 2011, Hicks reported that he was feeling more sociable and had decreased impulsivity. He also "indicated that he wanted to transfer to Coalinga State Hospital ('CSH') or Vacaville Intermediate Care Facility ('VICF') for treatment of 'sexual sadism,' which he indicated was his primary issue." Docket # 64-1 at 5. Kulka's plan was to continue Hicks' current medication, and "consider discharging the patient to CDCR where they might be able to refer him to a facility for sexual disorder treatment, as SVPP did not have a treatment program for his reported concern of sexual sadism." Docket # 64-1 at 5. Dr. Kulka discussed the treatment options with Hicks.

On October 21, 2011, a rehabilitation therapy assessment summarized Hicks' progress since entering the program, stating that he "was uncooperative, refused his vitals and was unable to attend therapy sessions because of his homicidal ideation and threats toward the staff." Docket # 64-1 at 5. Hicks told his rehabilitation therapist he wanted to leave. *Id.* Four days later, Hicks "threatened to 'snap the little neck' of a staff member." *Id.*

On November 11, 2011, the nursing notes reiterated that Hicks had a personality disorder with narcissistic, antisocial and borderline traits. Hicks did not believe the lithium was helping him. His main problems continued to be impulsiveness, anger management deficit and maladaptive coping skills. Hicks' medical records noted that he had feigned suicidal ideation to get a quicker referral to the program. Hicks asked for individual psychotherapy.

On November 22, 2011, Hicks' treatment team (including Dr. Kulka) met to work on his individualized treatment plan. Hicks requested to be promoted to Stage II. The team determined he needed to remain at Stage I and demonstrate two weeks of appropriate behavior before reconsidering the issue because he had recently had a DPS incident. Hicks "presented a letter regarding his request to have 'specific targeted treatment for [his] underlying issues of sexual sadism'; he felt that Vacaville would be the most appropriate place for transfer." Docket # 64-1 at 6-7. The goals set by the treatment team were for Hicks to work on skills to address anger management, impulsivity and maladaptive coping.

On December 9, 2011, Hicks indicated to Dr. Kulka that his medications were not working and that he was experiencing ongoing mood instability. Hicks wanted a transfer for his

5

sexual sadism. Dr. Kulka's impression was that Hicks was describing bipolar disorder and that his lithium level was sub-therapeutic, so he made medication changes that he discussed with Hicks. The medications changes included an increase in the dosage of lithium, a drug "generally used to address agitation and control suicidal ideation in patients." Docket # 64-1 at 7.

On December 11, 2011, Hicks was placed on DPS for inappropriate, unprovoked verbal obscenities toward a staff member.

On December 12, 2011, Hicks wrote a note to Mr. Knapp that stated: "I would like to request stage 3 status. Also, you said you would look into my transfer to CMF-ICF. The doctor there is Dr. Usaud (spelling) He has over 20 years in treating sexual disorders. . . . Finally, your (sic) delinquent on our agreed to one on ones. I will send the creditors after you." Docket # 13-9 at 2. Knapp responded with a note that stated:

> 1) Enclosed please find the criteria for movement to stage III status. It appears that you are meeting most of the criteria at this time. Your team will be happy to hear your rationale for wanting this change at your next team meeting (December 20th 2011).
> 2) As related to a transfer to CMF-ICF, we have discussed this several times. At this time, your only other transfer option within DMH is to Vacaville.
> [¶]
> 4) As far as my being "delinquent" in our 1:1's, here is what you have told your team and myself: that you did not feel comfortable speaking about your issues with MTA's in the room and that while you respected me, I was not "specifically trained" to deal with your particular problem area. If you still feel you will benefit from 1:1 sessions with me, I can offer you the following schedule . . . These sessions will include an MTA in the room, as per CDCR and DMH protocol.

Docket # 13-9 at 3. According to Knapp, "[w]e do not refer from one Intermediate Care Facility, such as SVPP, to another Intermediate Care Facility, and thus we could not transfer him as he requested. Whenever he brought this up, I told him that his only option was Vacaville – meaning CMF, Vacaville, but in their Acute Program and not the ICF program as he requested. Mr. Hicks did not meet the acute level of care at the time and thus, I told him, it would be up to his treatment team to transfer him." Docket # 64-2 at 2.

Although Hicks did not want to receive the treatment being offered at SVPP, he feared being ejected from SVPP and being returned to prison, so he filed a state court action to attempt to prevent his return to prison. The state court rejected his requests. Docket # 13 at 5.

On December 20, 2011, Dr. Kulka saw Hicks, who wanted a medication change and

1 wanted to be taken off DPS status. Dr. Kulka's plan was to made a medication change and
2 discuss Hicks' DPS status with the team.

3 Also on December 20, Hicks was seen by the treatment team for a 60-day review to
4 evaluate and update his individualized treatment plan. The progress notes of the team noted an
5 assessment of "Axis I - Bipolar (provisional) and Axis II: Antisocial and Narcissistic Personality
6 Disorder." Docket # 64-1 at 8. Hicks was retained on DPS status. Hicks again requested
7 treatment for sexual sadism. His main problems continued to be anger management, impulsivity
8 and maladaptive coping skills. Hicks had not achieved any of the previously set goals for coping
9 skills.

10 The parties have disagreed as to whether the treatment team or Dr. Kulka first determined
11 that Hicks should be discharged from SVPP. According to Hicks, the decision to discharge him
12 from SVPP was first made by Dr. Kulka, and was made later on December 20, 2011, after the
13 treatment team had met.[4] Docket # 57 at 2-3.

14 According to Hicks, on December 21, 2011, he talked to Dr. Kulka about his court action
15 and inmate appeal, and told Kulka "'I'm not taking your psych meds anymore. I don't like you,
16 and I want a different psychiatrist. I'm gonna sue you for medical malpractice.['] As a direct
17 result Kulka discharged [Hicks] without informing [him]." Docket # 1 at 6.[5] Dr. Kulka's plan
18 was to discontinue the lithium as the patient requested, and to discharge him back to CDCR.
19 The discharge plan was not conveyed to Hicks due to concerns that he might try to escape during
20 transfer – concerns that were based on the fact that Hicks had a conviction for escape many years

---

[4]According to Dr. Kulka, after discussing the above, the "treatment team determined that Mr. Hicks should be discharged to his CDCR facility when transportation was available; the CDCR would then determine Mr. Hicks' housing." Docket # 64-1 at 9. The Rehabilitation Therapy Final Discharge Summary form signed by a rehabilitation therapist stated: "Mr. Hicks is requesting treatment as he is a 'Sexual Sadist,' and requesting transfer to a different facility. As his diagnostic status classifies his primary diagnoses as Axis II, it is believed by his team that this patient has reached maximum benefit of this program and should be transferred to a facility better suited for his needs." DSH 756. The court accepts Hicks' version of the facts, as he is the non-movant.

[5]Although Hicks wrote in his verified complaint that this occurred on December 21, elsewhere he wrote that this occurred on December 20, 2011. As explained in the discussion below, the date does not affect the analysis.

7

earlier. After Hicks made superficial cuts to his forearm with a paperclip, Dr. Kulka saw him later that day. Hicks denied suicidal ideation but reported that he cut himself because he was upset. Dr. Kulka discussed with Hicks a plan to restart a medication.

Dr. Kulka had the responsibility to prepare the paperwork for a transfer once it was determined that an inmate would no longer benefit from the treatment program at SVPP. According to Dr. Kulka, "[o]nce the inmate was back at his original CDCR facility (i.e., the facility at which he resided prior to his transfer to SVPP), it was up to that facility to determine the future placement for that inmate. If an additional transfer was warranted (e.g., parole, transfer to another mental health facility, etc.), the CDCR facility would make that determination and arrange for the transfer or parole of the inmate." Docket # 64-1 at 10. As a member of the treatment team, Dr. Kulka "was not authorized to order additional transfers to mental health facilities or arrange for such transfers." *Id.* Once Hicks was returned to a prison, he would continue to receive mental health treatment at the prison through the enhanced outpatient program, and that treatment team could assess whether he warranted a transfer to a different facility for treatment of any sexual disorders. *Id.* at 11. A mental health placement chrono was prepared for him to be put in the enhanced outpatient program when he returned to prison. *See* DSH 237.

On December 29, 2011, Dr. Kulka saw Hicks, who requested a psychiatric assessment after learning he was being discharged to the CDCR. Despite many requests for a transfer, Hicks stated "that he wished to remain at SVPP and threatened to 'eventually attempt suicide at a CDCR facility'; however, he denied any current suicidal ideation." Docket # 64-1 at 12.

On January 1, 2012, Hicks was again placed on DPS because of his bad behavior. He then tore the signs off his cell door and kicked his cell door repeatedly. After an assessment, he was given medications to address his agitation. He refused some medications.

On January 6, 2012, the treatment team met with Hicks to discuss his individualized treatment plan. Hicks became irritated when told that he would remain on DPS because of several episodes of inappropriate behavior. Hicks got up and tried to leave the room unescorted, which was not permitted. "He then stated, 'I'm suicidal then' and spat at [Dr. Kulka], after which

he was restrained by staff." Docket # 64-1 at 13. Dr. Kulka's impression was that Hicks had narcissistic personality disorder and acute agitation secondary to remaining in DPS. He ordered that Hicks be sent to the observation room for safety and as a suicide precaution. Dr. Kulka also ordered a safety smock, safety tray, no sharp or pointy objects, and use of a spit mask while being escorted. Once Hicks left, the treatment team again agreed that discharge was appropriate due to the fact that SVPP was not able to provide treatment for Hicks' claimed sexual sadism. A few hours later, Dr. Kulka met Hicks at his cell. Hicks continued to be hostile and threatening, but agreed to take medications for his agitation. That day, the treatment team presented a summary of Hicks' case to the assistant program director, senior psychologist and social work supervisor, all of whom agreed that discharge to the CDCR was appropriate.

The next day, January 7, 2012, Hicks was removed from the observation room and was placed in the regular housing unit in a stripped cell with safety precautions.

On January 15, 2012, Hicks was put in a seclusion room for his safety because he presented a danger to himself. The staff was scheduled to check on him every 15 minutes. The next day, he was allowed to go back to his regular cell with some safety precautions.

On January 16, 2012, Hicks was discharged from SVPP to the CDCR, and was sent to Pelican Bay. At his discharge, he did not exhibit any psychotic symptoms. Dr. Kulka noted that Hicks seemed to have significant narcissistic and antisocial personality traits, and symptoms consistent with bipolar syndrome, although it was unclear whether he had the syndrome. Dr. Kulka's discharge recommendations included: "an ongoing assessment for further diagnostic clarification would be useful"; continued monitoring of laboratory studies to evaluate for possible metabolic difficulties with his lithium or antipsychotic medications; and "careful monitoring for self injurious behaviors." Docket # 64-1 at 16. Dr. Kulka noted that Hicks' sexual sadism concerns could be addressed in the CDCR.

In about late February 2012, Hicks was admitted to a mental health crisis bed unit for three weeks for suicidal ideation. *See* Docket # 1 at 6 (discharged from the unit on March 12, 2012).

9

C.   Hicks' Administrative Appeal

Hicks submitted an inmate health care appeal form dated October 15, 2011. In it he stated that he had been referred to the Department of Mental Health for his suicidal ideation. " I have a mood disorder and am schizoaffective-bipolar. I also have a sever[e] sexual sadism disorder. The combination of these factors cause me to want to harm myself and others and despare (sic) of my life. Though I am not suicidal, I wish I was dead. I feel like this on a daily basis. I have a life sentence, with no family. I'm high functioning and feel that S.V.P.P. has little to offer me as an 'educational' treatment model (groups)." Docket # 1-2 at 3. In the "action requested" part of the form, Hicks requested: "That my case be reviewed by DMH headquarters for alternate placement where I can receive extensive one:one with focus on *SVP* coping skills as well as self worth." *Id.* (emphasis added).

The inmate appeal was denied at the first level on November 7, 2011 in a response written by defendant Dosange. The response stated:

> Only the courts can classify sexually violent predators. If you are designated as a sexually violent predator per the courts and CDCR, then you can appeal to the courts for treatment. If you are under the custody and control of CDCR at the time that you are court ordered to attend sexually violent predator treatment, then it would fall under CDCR jurisdiction to address your placement at that time. [¶] Salinas Valley Psychiatric Program is not a treatment program for sexually violent predators. Salinas Valley Psychiatric Program is an Intermediate Care Facility treating Axis 1 serious mental disorders. You were admitted to SVPP on October 11, 2011, with an Axis 1 diagnosis of Mood Disorder NOS, and you are currently receiving treatment for this diagnosis.

Docket # 1-2 at 7.

Hicks appealed that denial to the second level. He wrote that the first level decision "misses the core of my complaint. I have an illness that causes me to want to hurt or kill myself. I seek 1:1 treatment from a clinician qualified to treat *SVP* disorders. Treatment is not available within CDCR and not here at SVPP. As a § 2684 I seek to go where there are people who know how to treat me." Docket # 1-2 at 4 (emphasis added).

The inmate appeal was denied at the second level on November 16, 2011 in a response written by defendant Neal. In her response, Neal wrote: "[A] review of your inpatient DMH mental health records indicates that you are in fact receiving therapeutic treatment for your Axis 1 diagnosis of Mood Disorder NOS. Per PC 2684 it falls under the jurisdiction of the Director

10

of Corrections and the Courts to determine your placement in a program to treat Sexually Violent Predators. It is beyond the scope of a Second Level Review to grant your appeal." Docket # 1-2 at 10. In her response, Neal cited to several statutes, including several provisions of California's Sexually Violent Predators Act.

Hicks presents no evidence that the term "sexually violent predator," occasionally abbreviated as "SVP," is a recognized medical or mental illness diagnosis. The term "sexually violent predator" is, however, defined in the Sexually Violent Predators Act ("SVPA"), California Welfare and Institutions Code § 6600 et seq., in a way that makes clear that the threat posed to other people (rather than to the inmate himself) is the paramount concern. "A 'sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." Cal. Welf. & Inst. Code § 6600(a)(1). A "'[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." *Id.* at § 6600(c).

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claim occurred in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Hicks' complaint and amended complaint are verified and therefore may be considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

**DISCUSSION**

A.   <u>The Motion For Summary Judgment</u>

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Hicks' claims arise under the Eighth Amendment's Cruel and Unusual Punishments

12

1 Clause rather than the Fourteen Amendment's Due Process Clause because he was in custody
2 serving a sentence on a criminal conviction at all relevant times. *See Bell v. Wolfish*, 441 U.S.
3 520, 536 & n.16 (1979); *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).

4       A prison official violates the Eighth Amendment only when two requirements are met:
5 (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is,
6 subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*,
7 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference
8 necessitates examining "the seriousness of the prisoner's medical need and the nature of the
9 defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992),
10 *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir.
11 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition
12 could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.*
13 (quoting *Estelle*, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or
14 she knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511
15 U.S. at 837. The official must both know of "facts from which the inference could be drawn"
16 that an excessive risk of harm exists, and he or she must actually draw that inference. *Id.*

17       Hicks fails to show a triable issue of fact in support of his claim that defendants were
18 deliberately indifferent to his serious medical needs. The evidence is undisputed that: (1) SVPP
19 did not offer any treatment for sexual disorders; (2) when Hicks was referred to SVPP for care,
20 his then-current diagnoses did not include any sexual disorder; (3) Hicks repeatedly requested
21 treatment for a sexual disorder, i.e., he repeatedly asked for one-on-one sexual disorder
22 psychotherapy with a clinician trained in the field; (4) defendants repeatedly informed him that
23 such treatment was not available at SVPP; (5) members of the treatment team were not
24 authorized to transfer him to other mental health facilities and had to return him to CDCR when
25 he finished at SVPP; (6) Hicks repeatedly demanded transfer to another facility to obtain his
26 desired treatment; (7) Hicks refused to cooperate in the treatment offered at SVPP; (8) Hicks was
27 discharged back to the CDCR when it was determined that he had received the maximum benefit
28 from SVPP; and (9) once back at CDCR, Hicks could continue to receive mental health care and

13

could be assessed for the claimed sexual disorder. The evidence further shows that while Hicks was at SVPP, he was continuously monitored by a treatment team of qualified professionals, was seen several times by a psychiatrist, had his medications adjusted periodically in response to changed circumstances, and was subjected to safety measures when he was perceived to be suicidal or dangerous to others. Viewing the evidence and reasonable inferences therefrom in the light most favorable to Hicks, no reasonable jury could find in his favor on his deliberate indifference claim.

At most, Hicks has established that he disagreed with the medical decisions made by Dr. Kulka and Mr. Knapp during his stay at SVPP. However, a mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted). Hicks didn't want the treatment that was offered at SVPP. He asked for one-on-one therapy sessions starting shortly after his arrival "because he believed that as a high functioning individual, the group educational treatment model contained very little benefit." Docket # 56 at 13. Hicks has not raised a triable issue of fact that the course of treatment chosen was medically unacceptable and chosen in conscious disregard of an excessive risk to his health. The evidence is undisputed that all of the decisions made by Dr. Kulka and Mr. Knapp complied with the applicable standard of care and that the decision to discharge Hicks from SVPP complied with the applicable standard of care.

Hicks has urged that Dr. Kulka improperly decided to discharge him from the SVPP for non-medical reasons because Hicks had threatened to sue Dr. Kulka for malpractice. He has failed to raise a triable issue of fact because the sequence is wrong: According to Hicks' evidence, Hicks threatened to sue Dr. Kulka for malpractice the day after Dr. Kulka made his decision to discharge Hicks. He points to the difference in two individualized treatment plans

14

dated December 20, 2011 to show that Dr. Kulka single-handedly decided to discharge him. *See* Docket # 56 at 26 and Exhibits J1 and J2. In his complaint, Hicks stated under penalty of perjury that he threatened to sue for malpractice, refused to take his medications and asked for a different psychiatrist on December 21, 2011. *See* Docket # 1-1 at 5-6. In his amended complaint (also made under penalty of perjury), he stated that Dr. Kulka decided on December 20 and 21, 2011 to discharge him from SVPP. Docket # 13 at 6. And he attached to his amended complaint as proof of that a medical record for December 20, 2011 that stated: "New order per Dr. Kulka for discharge orders to CDCR facility [with] 7 day supply of medications – when transportation is available." Docket # 13-7 at 2. The time on that notation is earlier in the day than the treatment team notation on the same page. *See id.* (discharge notation marked "915," and treatment team note marked "1330" on "12/20/11"). No reasonable jury could conclude that Hicks' statements on December 21, 2011 caused Dr. Kulka to decide the preceding day to discharge Hicks.

More significantly, it doesn't matter whether Dr. Kulka decided to discharge Hicks from SVPP after Hicks threatened litigation against him because the undisputed evidence makes it abundantly clear that there was no reason to keep the hostile patient at SVPP. It is undisputed that, in the two months leading up to this exchange, Hicks had persistently demanded treatment that was not offered at SVPP for a diagnosis that had not been made, wanted to be sent elsewhere to obtain the demanded treatment that was not provided at SVPP, and refused to cooperate and partake in the treatment that was offered at SVPP. There is no evidence to contradict defendants' assertion that Hicks had achieved the maximum benefit from his stay at SVPP when the decision was made to discharge him – regardless of who first proposed to discharge him. *See* Cal. Penal Code § 2684 (2011 version) (hospital superintendent keeps the inmate "until in the opinion of the superintendent the person has been treated to the extent that he or she will not benefit from further care and treatment in the state hospital"). The uncontradicted evidence amply supports Dr. Kulka's summation of the situation: "Hicks was uncooperative with the SVPP staff members and continually insisted on obtaining treatment for 'sexual sadism,' despite the fact that SVPP did not offer such treatment," and had been sent for

15

1 treatment of specified psychological disorders (including suicidal ideation and mood disorders),
2 none of which included sexual sadism. Docket # 64-1 at 10. Because he was not sent to SVPP
3 for "sexual sadism," the treatment plan was not directed toward that issue.

4 When the evidence is viewed in the light most favorable to Hicks, and inferences
5 therefrom drawn in his favor, no reasonable jury could return a verdict for him and against
6 defendants. Defendants therefore are entitled to judgment as a matter of law on the merits of his
7 Eighth Amendment claim.

8 Hicks also has failed to show a triable issue of fact in support of his claim that defendants
9 Neal and Dosange were deliberately indifferent to his serious medical needs in denying his
10 inmate appeals. The undisputed evidence shows that Hicks' inmate appeals were denied
11 because: (1) he requested an alternative placement where he could "receive extensive one:one
12 with focus on SVP coping skills as well as self worth," Docket # 1-2 at 3; (2) he had not been
13 classified as a sexually violent predator; and (3) neither the SVPP nor the Department of State
14 Hospitals were authorized to designate Hicks as a sexually violent predator. Further, there is
15 no evidence that any doctor had ordered the kind of treatment that Hicks requested and no
16 evidence that Hicks was competent to formulate his own treatment plan.[6] Viewing the evidence
17 and reasonable inferences therefrom in the light most favorable to Hicks, no reasonable jury
18 could conclude that the inmate appeal responders were deliberately indifferent to his serious
19 medical needs in denying his inmate appeals.

20 Hicks has stated that he never requested transfer to the civil commitment SVP program
21 at Coalinga State Hospital, and instead he only wanted one-on-one treatment with a focus on
22 sexually violent predator coping skills. Docket # 56 at 14. At first glance, it does appear odd
23 that the inmate appeal responses discussed the need for a court to determine that Hicks was an
24 SVP before he could get SVP coping skills treatment. However, the references to legal
25 proceedings make sense once one realizes that the SVP label is a legal term of art, rather than

---

[6]Although Hicks is competent to describe his feelings and symptoms, as well as his beliefs about their causes, he has not presented any evidence that he is competent to render a psychiatric diagnosis or to identify the medically appropriate standard of care for a mental illness.

16

a medical diagnosis. *See* Cal. Welf. & Inst. Code § 6600(a)(1) ("A 'sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.") Defendants' inmate appeal responses perhaps misunderstood Hicks' real meaning by focusing on his references to "SVP," a legal term of art, but that does not support an inference of deliberate indifference to his serious medical needs. All defendants are entitled to judgment as a matter of law in their favor.[7]

B.   Miscellaneous Motions

Hicks has requested appointment of counsel because he finds it uncomfortable to deal with females in this matter. *See* Docket # 52 at 1. A district court has the discretion under 28 U.S.C. §1915(e)(1) to designate counsel to represent an indigent civil litigant in exceptional circumstances. *See Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986). This requires an evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues involved. *See id.* Neither of these factors is dispositive and both must be viewed together before deciding on a request for counsel under § 1915(e)(1). Here, exceptional circumstances requiring the appointment of counsel are not evident. The request for appointment of counsel is DENIED.

In his request for appointment of counsel, Hicks has urged: "Your Honor should consider removing herself from this case. Your rulings are not setting well with my mental disorder and your (sic) causing me to be in despair and suicidal." Docket # 52 at 1. Assuming this is a recusal request, the request is DENIED because Hicks did not provide a timely affidavit that the undersigned "has a personal bias or prejudice either against him or in favor of any adverse

---

[7] Hicks' allegations about problems he currently experiences with guards and medical care providers at CSP - Sacramento in 2013 are outside the scope of this action. If he wants to file an action complaining about those conditions, the proper venue for a civil rights complaint about those prison conditions would be the Eastern District of California.

17

party," 28 U.S.C. § 144. Absent a legitimate reason to recuse herself, a judge has a duty to sit in judgment in all actions assigned to that judge. *See United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008).

In his request for appointment of counsel, Hicks has stated that he will be suicidal or engage in self-harm if he receives an unfavorable ruling in this case. *See* Docket # 52 at 3. Such transparent attempts to improperly manipulate the adjudicatory process don't sway the court. If Hicks needs mental health care, he should make an appropriate request at his prison.

Shortly after defendants filed their motion for summary judgment, Hicks filed a motion to have the U.S. Marshal serve a records subpoena on Rosen, Bien & Galvan, the law firm that represents prisoners in the *Coleman v. Brown* class action, to produce "all correspondence with Coleman special master and special master psychiatrist regarding sexual disorder and treatment for Michael Hicks." Docket # 53 at 4. Defendants opposed the motion on the ground that the subpoena was overbroad in that it was not limited as to time and seeks irrelevant records. The *Coleman* class action began in 1990 and is ongoing, so that medical records responsive to the subpoena could be up to 23 years old. Docket # 54-1 at 2. Additionally, defendants presented uncontradicted evidence that "it would be a considerable financial and time burden for individuals from the firm to order files from storage, re-open the files, and search[] for" materials responsive to the subpoena. *Id.* A subpoena is subject to the relevance requirements set forth in Federal Rule of Civil Procedure 26(b), i.e., the subpoena may command the production of documents which are "nonprivileged" and are "relevant to any party's claim or defense" or "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). A "relevant matter" under Rule 26(b)(1) is any matter that "bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Upon a timely request, the court will quash a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(c)(3)(A)(iii). Hicks' motion to have the subpoena served has become moot as a result of this order granting summary judgment for defendants. No motion was filed under Rule 56(d), and Hicks has not shown his entitlement to a continuance of the

summary judgment motion under that section. Even if the subpoena issue wasn't moot, the motion must be denied because compliance with the subpoena would unduly burden the third party witness. Compliance with the subpoena would require the witness to cull through 23 years of records in a massive prisoner class action to find responsive documents that would be of little or no value in the present action. There is no suggestion that the correspondence between third parties would provide any admissible evidence or would be reasonably calculated to lead to admissible evidence in this action in which defendants' Eighth Amendment liability depends on their actual knowledge, and not on what they should have known. The views of class counsel for the prisoner-plaintiffs and the views of the special master and his expert (none of whom represent any defendant) do not appear to have any bearing on Hicks' Eighth Amendment claim against staff at the SVPP.

Finally, after defendants filed their motion for summary judgment, Hicks filed a "motion to amend parties to complaint with dismissal of *all* individual parties." (Docket # 55 (emphasis in source).) In this motion, Hicks has stated that, upon reviewing substantial portions of the discovery provided, he determined that it may be in the best interests of parties to dismiss all the individual defendants and replace them with a new defendant, the California Department of State Hospitals, so that the court could, among other things, consider the case for class certification to address a systemic problem. Hicks has explained that he determined that his real need is for a program like the sexually violent predator program offered to persons civilly committed under the SVPA but for which prisoners serving criminal sentences are ineligible. The motion to amend is DENIED. (Docket # 55.) It is not in the interest of justice to allow a plaintiff to completely change the defendant list and the claims alleged at this late date, and after the original defendants have filed a dispositive motion. In effect, Hicks proposes to make this a new action. To pursue a new action, he must file a new civil rights complaint in the appropriate venue, after exhausting his administrative remedies as to any new claims.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 64.) Defendants are entitled to judgment as a matter of law on the merits of plaintiff's claims. Judgment will be entered in all defendants' favor and against plaintiff.

Plaintiff's motions for appointment of counsel and to recuse (Docket # 52), motion to have a subpoena served (Docket # 53) and motion to amend (Docket # 55) are DENIED.

The clerk will close the file.

IT IS SO ORDERED.

Dated: November 4, 2013

_____
SUSAN ILLSTON
United States District Judge